Dissent by Judge Bea OPINION FISHER, Circuit Judge: Montana limits the amount of money individuals, political action committees and political parties may contribute to candidates for state elective office. The district court invalidated these limits as unduly restrictive of political speech under .the First Amendment. Because Montana’s limits are both justified by and adequately tailored to the state’s interest in combating quid pro quo corruption or its appearance, we reverse. Montana has shown the risk of actual, or perceived quid pro quo corruption in Montana politics is more than “mere conjecture,’’ the low bar it must surmount before imposing contribution limits of any amount. The state has offered evidence of attempts to purchase legislative action with campaign contributions. Contribution limits serve the state’s important interest in preventing this risk of corruption from becoming reality. Montana’s limits are also “closely drawn” to serve the state’s anti-corruption interest. The limits target those contributions most likely to result in actual or perceived quid pro quo corruption—high-end, direct contributions with a significant impact on candidate fundraising. Moreover, the limits are tailored to avoid favoring incumbents, not to curtail the influence of political parties, and to permit candidates to raise enough money to make their voices heard. Although Montana’s limits are lower than,most other states’ in absolute terms, they are relatively high when comparing each state’s limits to the cost of campaigning there. Thus, Montana’s chosen limits fall within the realm of legislative judgments we may not second guess. I. Background A. Montana’s Contribution Limits In 1994, Montana voters passed Initiar five 118, a campaign finance reform package that included the contribution limits at issue here. I-118’s limits replaced a regime that had been in place since 1975. That regime permitted individuals and political parties to contribute up to the following limits: Table 1: Pre-Initiative 118 Limits [[Image here]] See Mont. Code Ann. § 13-37-216 (1975) (enacted by No. 23-4795, 1975 Mont. Laws Ch. 481 § 1). 1-118 lowered the cap on individual contributions while raising the cap on contributions from political parties.[1] Although the contribution limits at issue here originate from 1-118, the limits have not remained static. Since I-118’s enactment, the Montana legislature has both amended the limits and indexed them to inflation. See id. § 13-37-216 (2003) (raising the limits); Act of Apr. 27, 2007, 2007 Mont. Laws Ch. 328 § 1 (H.B. 706) (indexing the limits to inflation); Admin. R. Mont. 44.11.227. Moreover, unlike the pre-1994 limits, I-118’s limits apply per election (rather than per cycle), so a contributor may give up to the maximum twice if a candidate faces a contested primary (once for the primary and once for the general election). See Mont. Code Ann. § 13-37-216(5); Mont. Comm’r of Political Practices, Amended Office Mgmt. Policy 2.4 Reinstating Pre-Lair 2016 Campaign Contribution Limits at 2 (May 18, 2016) (“Pre-1994 Limits Policy”), http://politicalpractices.mt.gov/ contenVContributionLimitPolicy (explaining that the pre-I-118 limits applied per cycle). Table 2 shows the post 1-118 contribution limits in 1994 (when they were enacted), 2011 (when this lawsuit began) and today. Table 3 compares the pre-I-118 limits to the post 1-118 limits as of 2017. Table 2: Post-Initiative 118 Limits[2] [[Image here]] See Mont. Code Ann. § 13-37-216; Admin. R. Mont. 44.11.227. Table 3: Pre-Initiative 118 Limits vs. 2017 Limits [[Image here]] B. Eddleman We first addressed—and upheld—thé constitutionality of Montana’s contribution limits in Montana Right to Life Ass’n v. Eddleman, 343 F.3d 1085 (9th Cir. 2003). Applying Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), and Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000), we held state campaign contribution limits will be upheld if (1) there is adequate evidence that the limitation furthers a sufficiently important state interest, and (2) if the limits are “closely drawn”—i.e., if they (a) focus narrowly on the state’s interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign. Eddleman, 343 F.3d at 1092. At step one, we held Montana’s limits furthered the state’s “interest in preventing corruption or the appearance of corruption.” Id. In reaching this conclusion, we noted “[t]he evidence presented by ,.. Montana ... [wa]s sufficient to justify the contribution limits imposed, and indeed carrie[d] more weight than that presented in Shrink Missouri.” Id. at 1093. We defined “corruption” or its appearance to include both “instances of bribery of public officials” and “the broader threat from politicians too compliant with the wishes of large contributors.” Id. at 1092 (quoting Shrink, 528 U.S. at 389, 120 S.Ct. 897). At step two, we held Montana’s limits were “ ‘closely drawn’ to avoid unnecessary abridgement of associational freedoms.” Id. at 1093. The limits were adequately tailored to the state’s “interest in preventing corruption and the appearance of corruption” because they “affect[ed] only the top 10% of contributions, and ... the percentage affected includefd] the largest contributions”—those most likely to be associated with actual or perceived corruption. Id. at 1094. The limits also allowed candidates to amass sufficient resources to wage effective campaigns, as shown by testimony from candidates and statistics demonstrating the minor effects of the limits on fundraising compared to the low cost of campaigning in Montana. See id. at 1094-95. The limits, moreover, had caused no significant difference in the amount challengers were able to raise compared to incumbents. See id. at 1095. We therefore upheld Montana’s limits. C. Randall Three years later, the Supreme Court’s decision in Randall v. Sorrell, 548 U.S. 230, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006), left Eddleman’s holding on less stable footing. Randall invalidated Vermont’s contribution limits, and a three-justice plurality led by Justice Breyer proposed a new two-part, multi-factor “closely drawn” test. As we subsequently explained, [ujnder [the Randall] test, the reviewing comb first should identify if there are any “danger signs” that the restrictions on contributions prevent candidates from amassing the resources necessary to be heard or put challengers at a disadvantage vis-a-vis incumbents. [Randall, 548 U.S.] at 249-52 [126 S.Ct. 2479]. The plurality found four “danger signs” in Vermont’s contribution limits: “(1) The limits are set per election cycle, rather than divided between primary and general elections; (2) the limits apply to contributions from political parties; (3) the limits are the lowest in the Nation; and (4) the limits are below those we have previously upheld.” Id. at 268 [126 S.Ct. 2479] (Thomas, J., concurring) (listing the plurality’s “danger signs”). The plurality held, if such danger signs exist, then the court must determine whether the limits are “closely drawn.” The plurality looked to “five sets of considerations” to determine whether the statute was closely drawn: (1) whether the “contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns”; (2) whether “political parties [must] abide by exactly the same low contribution limits that apply to other contributors”; (3) whether “volunteer services” are considered contributions that would count toward the limit; (4) whether the “contribution limits are ... adjusted for inflation”; and (5) “any special justification that might warrant a contribution limit so low or so restrictive.” Id. at 253-62 [126 S.Ct. 2479]. Lair v. Bullock, 798 F.3d 736, 743 (9th Cir. 2016) (Lair IT) (last two alterations in original) (citations omitted). Although this test is in many respects similar to the tailoring inquiry at step two of the Eddle-man analysis, it does not map perfectly onto Eddleman. D. Lair After Randall, the plaintiffs commenced this action challenging Montana’s limits a second time. The district court concluded Randall abrogated Eddleman’s, approach to evaluating contribution limits and held Montana’s limits were invalid under Randall. See Lair v. Murry, 903 F.Supp.2d 1077, 1093 (D. Mont. 2012). Montana appealed. Because the district court’s decision came weeks before a state election, Montana sought a stay pending appeal, which a motions panel of this court granted in a published decision: See Lair v. Bullock, 697 F.3d 1200, 1202 (9th Cir. 2012) (Lair I). The motions panel held Randall had not abrogated Eddleman, because no “opinion .[in Randall] can be meaningfully regarded as narrower than another and can represent a common denominator of the Court’s reasoning.” Id. at 1206 (quoting United States v. Rodriguez-Preciado, 399 F.3d 1118, 1140 (9th Cir.), amended by 416 F.3d 939 (9th Cir. 2006)). Assuming arguendo Justice Breyer’s plurality opinion was controlling, Lair I concluded Randall applied rather than altered Buckley, the primary decision upon which Ed-dleman had relied. Id. at 1206-08. Finally, even applying Randall ⅛ somewhat different “closely drawn” analysis, Lair I concluded Montana’s limits would likely survive scrutiny. Id. at 1208-13. We then heard Montana’s appeal on the merits. See Lair II, 798 F.3d at 744. In Lair II, we followed the motions panel’s holding that Randall did not abrogate Ed-dleman ⅛ general approach to evaluating contribution limits. Id. at 747. We also held, however, that the Supreme Court’s decisions in Citizens United v. FEC, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), and McCutcheon v. FEC, — U.S. —, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014), had limited the important state interest at Eddleman ⅛ first step to preventing “quid pro quo corruption, or its appearance.” Lair II, 798 F.3d at 746. McCutcheon defined quid pro quo corruption as “a direct exchange of an official act for money” or “dollars for. political favors” and the “appearance” of quid pro quo corruption as “public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions to particular candidates.” 134 S.Ct. at 1441, 1450 (internal quotation marks omitted). Because Eddleman had relied on a broader definition of corruption—embracing both quid pro quo and a generalized “access and influence” theory—Citizens United and McCutcheon undermined Eddle-man ’s holding that Montana’s limits were justified by an important state interest. We therefore remanded for the district court to evaluate Montana’s limits under the Eddleman framework, but with the important state interest limited to preventing actual or perceived quid pro quo corruption. On remand, the district court held the limits unconstitutional under both prongs of Eddleman. In the district court’s view, Montana did not provide adequate evidence that its contribution limits further the state’s interest in combating quid pro quo corruption or its appearance. The court acknowledged evidence of various attempts to obtain political favors through campaign contributions but concluded these examples were inadequate because they did not show the attempted corruption succeeded. “The sticking point with respect to the evidence Defendants rely upon is that the quids in each one of the cited instances were either rejected by, or were unlikely to have any behavioral effect upon, the individuals toward whom they were directed.” Lair v. Motl, 189 F.Supp.3d 1024, 1034 (D. Mont. 2016). Under Eddleman’s “closely drawn” prong, the district court concluded the limits both prevented candidates from campaigning effectively and were not'narrowly focused, “because they were expressly enacted to combat the impermissible'interests of reducing influence and leveling the playing field;” Id. at 1035. Montana again appealed. We have jurisdiction under 28 U.S.C. § 1291, and we reverse. II. Standard of Review We generally review- a district court’s legal conclusions de novo and its factual findings for clear- error. See Lair II, 798 F.3d at 745. In the First Amendment context, however, “our review [of the district court’s fact finding] is more rigorous than other cases.” Id. at 748 n.8; see also Randall, 548 U.S. at 249, 126 S.Ct. 2479 (plurality opinion) (“[C]ourts, including appellate courts, must review the record independently and carefully with an eye toward assessing the statute’s ‘tailoring,’ that is, "toward assessing the proportionality of the restrictions.”). In addition, we “review the application of [the] law to those facts de novo on free speech issues.” Lair II, 798 F.3d at 745. III. Discussion A. Important State Interest Under Eddleman, we ask first whether “there .is adequate evidence that [Montana’s] limitation^] further[ ] ... [the] important state interest” of preventing actual or perceived quid pro quo corruption. 343 F.3d at 1092. This step of the inquiry is divorced from the actual amount of the limits—it is a threshold question whether any level of limitation is justified. As we explained in Eddleman: [The- plaintiff] does not dispute that [Montana’s interest in combating corruption] is sufficient to justify campaign contribution limits. Rather, [the plaintiff] argues that the limits imposed are unnecessarily stringent..... This, however, is not the appropriate inquiry [at step one]. The correct focus ... is whether the state has presented sufficient evidence of a valid interest, not whether it has justified a particular dollar amount. The latter inquiry, if ever appropriate, occurs in the second part of our analysis, in. examining whether the restriction is “closely drawn.” Id. To satisfy its burden, Montana must show the risk of actual .or perceived quid pro quo corruption is more than “mere conjecture.” Id. (quoting Shrink, 528 U.S. at 392, 120 S.Ct. 897); see McCutcheon, 134 S.Ct. at 1452 (reiterating the “mere conjecture” standard). Montana need not show any instances of actual quid pro quo corruption. See Thalheimer v. City of San Diego, 645 F.3d 1109, 1121 (9th Cir. 2011). It must show “only that the perceived" threat [is] not ... ‘illusory.’ ” Eddleman, 343 F.3d at 1092 (quoting Buckley, 424 U.S. at 27, 96 S.Ct. 612). This evidentiary burden is lowest where, as here, the -state’s purported interest is neither “novel” nor “implausible.” Because the regulations at issue in Shrink were similar to those in Buckley, the state’s asserted interest was neither novel nor implausible. Therefore, the Court declined to impose, let alone articulate, a stringent evidentiary burden. Shrink dealt with direct contributions to candidates, and Buckley established that a limit on the amount of such contributions is “only a marginal restriction upon the contributor’s ability to engage in free communication” that can be justified by the government’s interest in preventing “political quid pro quo -from current and potential office holders.” 424 U.S. at 20-21, 26, 96 S.Ct. 612. Thalheimer, 646 F.3d at 1122 (citations and internal quotation marks omitted).[3] ■ Here, the important state interest requirement is satisfied. The plaintiffs do not dispute that Montana’s interest in combating quid pro quo corruption or its appearance justifies some level bf contribution limit. Indeed, the plaintiffs conceded at oral argument that they believed Montana’s pre-1994 limits were constitutional. . Even if the plaintiffs challenged this conclusion they would not succeed, because Montana’s evidence shows the threat of actual or perceived quid pro quo corruption in Montana politics is not illusory. State Representative Hal Harper testified groups “funnel[] more money into campaigns when certain special interests know an issue is coming up, because it gets results.” State Senator Mike Anderson sent a “destroy after reading” letter to his party colleagues, urging them to vote for a bill so a PAC would continue to funnel contributions to the party: Dear Fellow Republicans. Please destroy this after reading. Why? Because the Life Underwriters Association in Montana is one of the larger Political Action Committees ■ in the state, and I don’t want the Demo’s to know about it! In the last election they gave $8,000 to state candidates. ,..' Of this $8,000— Republicans got $7,000—you probably got something from them. This bill -is important to the underwriters and I have been able to keep the contributions coming our way. In 1983, the PAC will be $15,000. Let’s keep it in our camp. State Senator Bruce Tutvedt stated in a declaration that during the 2009 legislative session the National Right to Work group promised to contribute at least $100,000 to elect Republican majorities in. the next election if he and his colleagues introduced and voted for a right-to-work bill in the 2011, legislative session. Finally, a state court found two 2010 state legislature candidates . violated state election laws by accepting large contributions from a corporation that “bragged ... that those candidates that it supported ‘rode into office in 100% support bf [the corporation’s] ... agenda.’ ” See Comm’r of Political Practices v. Prouse, DDV-2014-250 (1st Jud. Dist. Mont. 2016); Comm’r of Political Practices v. Boniek, XADV-2014-202 (1st Jud. Dist. Mont. 2015). In concluding this evidence failed to justify contribution limits, the district court imposed too high an evidentiary burden on Montana.[4] The court held Montana’s evi- ■ dence was inadequate because the attempted corruption did not succeed—the “quids” did not lead to “quos.” See Lair, 189 F.Supp.3d at 1034. But Montana need not show any completed quid pro quo transactions to satisfy its burden. It simply must show the risk of actual or perceived quid pro quo corruption is not illusory, a bar Montana’s evidence easily clears. Montana’s contribution limits are of the same kind as in Shrink and Buckley, and they are supported by at least as much evidence as was present in those cases. See Shrink, 528 U.S. at 393-94, 120 S.Ct. 897 (noting a statement from a legislator “that large contributions have ‘the real potential to buy votes’ “newspaper accounts of large contributions supporting inferences of impropriety”; an example of a “state representative ... ‘accused of sponsoring legislation in exchange for kickbacks’ ” (but not convicted); and a scandal in which the former attorney general pled guilty to misusing state property to benefit campaign contributors); Buckley, 424 U.S. at 27 n.28, 96 S.Ct. 612 (referencing generic “abuses uncovered after the 1972 elections”). Montana, therefore, has offered adequate evidence that its limits further the important state interest of preventing quid pro quo corruption or its appearance.[5] B. “Closely Drawn” We next address whether “the limits are ‘closely drawn’—i.e., [whether] they (a) focus narrowly on the state’s interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign.” Eddleman, 343 F.3d at 1092. This tailoring inquiry “ensures the state’s contribution limits are not lower than needed to accomplish the state’s goal of preventing quid pro quo corruption or its appearance.” Lair II, 798 F.3d at 740 n.4. In conducting this inquiry, courts owe significant deference to the legislative process. As Buckley explained, courts have “no scalpel to probe” these legislative judgments, so “distinctions in degree become significant only when they ... amount to differences in kind.” 424 U.S. at 30, 96 S.Ct. 612 (citation omitted). Thus, “the dollar amounts employed to prevent corruption should be upheld unless they are ‘so radical in effect as to render political association ineffective, drive the sound of a candidate’s voice [below] the level of notice, and render contributions pointless.’ ” Eddleman, 343 F.3d at 1094 (quoting Shrink, 528 U.S. at 397, 120 S.Ct. 897). 1. Narrow Focus The first part of the closely drawn analysis is whether the limits are narrowly focused on Montana’s anti-corruption interest. We assess the “fit between the stated governmental objective and the means selected to achieve that objective,” McCutcheon, 134 S.Ct. at 1445, looking at whether the limits target “the narrow aspect of political association where the actuality and potential for corruption have been identified,” Buckley, 424 U.S. at 28, 96 S.Ct. 612. Here, because Montana’s limits target the kinds of contributions most likely to be associated with quid pro quo corruption, they satisfy the narrow focus inquiry. First, 1-118 targeted only the top 10% of pre-1994 contributions in Montana—the high-end contributions most likely to result in actual or perceived corruption. See Eddleman, 343 F.3d at 1094. We relied on this fact in Eddleman to conclude the limits were narrowly focused. See id. Because the 1-118 limits were not indexed to inflation when Eddleman was decided, moreover, today’s limits affect an even smaller percentage of contributions at the top of the range than they did at that time. Second, Montana places the strictest limits on direct monetary contributions to candidates—the type of largesse most likely to effect actual or perceived corruption. See Shrink, 528 U.S. at 393-94, 120 S.Ct. 897 (focusing on direct contributions in discussing the evidence of corruption justifying Missouri’s contribution limits). Political party contributions—i.e., indirect contributions—are capped tens of thousands of dollars higher. Cf. Randall, 548 U.S. at 256, 126 S.Ct. 2479 (plurality opinion) (imposing the same limits on individuals and political parties cuts against upholding the limits). Moreover, Montana’s “statute in no way prevents [individuals and] PACs from affiliating with their chosen candidates in ways other than direct contributions, such as donating money to a candidate’s political party, volunteering [their] services, sending direct mail to their supporters, or taking out independent newspaper, radio, or television ads to convey their support.” Eddleman, 343 F.3d at 1094. This, too, shows tailoring for the type of contribution most likely associated with dollars-for-favors exchanges, without unnecessarily curtailing other forms of political expression. The plaintiffs argue Montana could accomplish its goals with higher limits, but they seek a level of constitutional precision the Supreme Court has never required— Montana need not “fíne tune” its limits to stay within the First Amendment’s boundaries. As Buckley explained, Appellants’ first overbreadth challenge ... rests on the proposition that most large contributors do not seek improper influence .... Although the truth of that proposition may be assumed, it does not undercut the validity of the $1,000 contribution limitation. Not only is it difficult to isolate suspect contributions, but, more importantly, Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated. A second, related overbreadth claim is that the $1,000 restriction is unrealistically low because much more than that amount would still not be enough to enable an unscrupulous contributor to exercise improper influence .... While the contribution limitation provisions might well have been [higher in some cases], Congress’ failure to engage in such fíne tuning does not invalidate the legislation. 424 U.S. at 29-30, 96 S.Ct. 612. Here, especially given that the plaintiffs do not dispute the constitutionality of the pre-1994 limits, they ask us to police a “distinction[] in degree,” not a “difference[ ] in kind.” Id. at 30, 96 S.Ct. 612 (noting the difference between $1,000 and $2,000 was a distinction in degree). This is a legislative judgment we decline to second guess.[6] We acknowledge Montana’s chosen dollar amounts might appear low,- but they are not constitutionally suspect. First, Montana’s limits are not an outlier compared to other states’ limits: Table 4: 2015-2016 Limits on Contributions to Gubernatorial Candidates[7] [[Image here]] Second, even if the limits are low in absolute terms, they are quite reasonable compared to the low cost of campaigning in the state. Montana to the present is “one of ..the least expensive states in the nation in which to run a political campaign,” Eddleman, 343 F.3d at 1094. When contribution limits are viewed in relation to the cost of campaigning for a state house seat, Montana’s limits are proportionally higher than both the federal limits and those of 12 other states.[8] Table 5 'shows contribution limits relative to the cost of campaigning in the nine states within the Ninth Circuit: Table 5: Maximum Contributions as a Percentage of Total Fundraising in 2010 State House Races[9] [[Image here]] Montana’s limits are low only if we ignore the low cost of campaigning in the state. Once that reality is factored in, Montana’s limits fit well within the mainstream. Third, Montana’s limits are reasonable compared to the size of a typical contribution in Montana. In 2010 state house races, for example, the average individual contributed about $90, when the per cycle limit was $820, In the 2008 race.for governor, the typical contribution was only $185, when the per cycle limit was $1200. Thus, in addition to targeting only the. top 10% of contributions, the limits do not come close to curtailing the average contributor’s participation in campaigns. Fourth, Montana’s limits are reasonably keyed to the actual evidence showing a risk of corruption in Montana. In his “burn after reading” letter, written shortly before 1-118 was passed, Senator Anderson suggested a political action committee could obtain political favors from an entire block of legislators through contributions totaling just $8,000. Even adjusted for inflation, that is only a few hundred dollars per legislator. If such contributions can corrupt the legislative process, Montana’s limits are anything but an exaggerated response to the risk of actual or perceived corruption that exists in the, state. We should not—and indeed cannot—be in the business of fine tuning contribution limits for states. These judgments are for state lawmakers to make (including voters acting through the initiative process). As judges, our limited role is to ensure that a state chooses limits that are not “so radical in effect as to render political association ineffective, drive the sound of a candidate’s voice below the level of notice, and render contributions pointless.” Shrink, 528 U.S. at 397, 120 S.Ct. 897. Because Montana’s limits' satisfy this standard, we hold they are narrowly focused. The district court concluded otherwise because, in the 1994 Voter Information Pamphlet attached to 1-118, the initiative’s sponsors argued “[tjhere is just way too much money in Montana politics” and urged voters to pass 1-118 to prevent “[m]oney from special interests and the wealthy” from “drowning out the voice of regular people,” reasons that, are made-quate to justify contribution limits under McCutcheon. The district court thus concluded the Montana voters who approved 1-118 acted with an impermissible motive, meaning the limits “could never be said to focus narrowly on a constitutionally-permissible anti-corruption interest.” Lair, 189 F.Supp.3d at 1035. We disagree. The district court incorrectly cast the narrow focus test as a motive inquiry that looks at the voters’ underlying intent when they enacted the limits. The narrow focus test, however, is a tailoring test, not a motive test. It measures how effectively the limits target corruption compared to how much they inhibit associational freedoms—i.e., whether the limitation focuses precisely on the problem of large campaign contributions— the narrow aspect of political association where the actuality and potential for corruption have been identified—while leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources. Buckley, 424 U.S. at 28, 96 S.Ct. 612; see Eddleman, 343 F.3d at 1094 (analyzing fit without reference to underlying voter intent). We are aware of no case looking to underlying legislative or voter intent in making this evaluation. Although there is some logic that the sponsors’ goal behind 1-118 reveals something about the limits’ fit, the actual content and effect of the limits—which, as discussed, target the contributions most likely to generate corruption or its appearance—better show their tailoring. We therefore disapprove the district court’s reasoning. 2. Contributors’ Ability to Affiliate with Candidates The closely drawn inquiry next assesses whether the contribution limits “leave the contributor free to affiliate with a candidate.” Eddleman, 343 F.3d at 1092. Montana not only permits such affiliation through direct monetary contributions, but also “in ways other than direct contributions, such as donating money to a candidate’s political party, volunteering ,.., sending direct mail ..., or taking out independent newspaper, radio, or television ads to convey ... support.” Id. at 1094. The plaintiffs effectively concede that contributors may associate with candidates, arguing only that some contributors would like to give more than the limits allow. Thus, Montana’s limits satisfy prong two of the closely drawn analysis. 3. Candidates’ Ability to Campaign Effectively The final part of the closely drawn inquiry asks whether Montana’s limits prevent candidates from amassing sufficient resources to campaign effectively. Eddle-man held they did not, see 343 F.3d at 1095, and we see no reason to reach a different conclusion. To begin with, the evidence from Montana candidates shows the limits do not prevent effective campaigning. Montana Secretary of State Mark Cooney testified, “I don’t feel that the limitations ... have been harmful to my candidacy at all.” Representative Harper testified the limits had “[jjust negligible effects” on his campaigns. Another candidate testified he raised more money after the limits were in place than before. Although one candidate initially testified the limits made it “more difficult” for him to raise enough money, he later clarified he “didn’t mean that [his campaigns] were ineffective.” He explained, “I mean I did what I had to to win. If my opponents would have been tougher and I felt that I needed to, I would have raised more money, gone out and done the work that I needed to to run that effective campaign.” One candidate witness (Mike Miller) did suggest the limits made his campaigns ineffective, but the facts belie his claim. Between 2008 and 2014, Miller’s campaigns received maxed-out contributions from only seven of his approximately 200 contributors, and Miller won all four of his elections. Statistical data confirm that the limits do not prevent effective campaigning. Plaintiffs’ expert Clark Bensen opined that “a high proportion of maxed-out donors” would be an indicator that “the limits were too low.” Suppl. Excerpts R. 109 (“Bensen Report”). In Montana, however, maximum contributions are relatively rare. In 2010 state house and senate races, for example, 85% of individual contributors gave less than the statutory limit.[10] Political parties contributed below the limit 78% of the time. Numbers from other years and other races are comparable. This low proportion of maximum contributions shows the limits do not unduly inhibit candidate fundrais-ing. The plaintiffs argue competitive elections provide the proper context for evaluating contribution limits, and they point out that the percentage of maximum contributions in competitive elections is higher, about 29%. The plaintiffs are correct that the plurality opinion in Randall focused on competitive races rather than average ones. See 548 U.S. at 255-56, 126 S.Ct. 2479. But this focus was based on the potential advantage contribution limits might grant incumbents in competitive races. See id. Because these races tend to be more expensive, challengers, may need to rely on large contributions more than incumbents do, so overly strict limits could disproportionately affect challengers. See id. at 256, 126 S.Ct. 2479. The plaintiffs, however, have not shown this problem exists in Montana. Incumbents and challengers in competitive races have virtually the same' percentage of maxed-out contributors. See Bensen Report at 101 (“There was very little difference with respect to incumbency [versus challengers]” as to who relied on maximum or near maximum contributions in competitive races.); cf. Randall, 548 U.S. at 253-55, 126 S.Ct. 2479 (citing to an expert report, also by Clark Bensen, showing Vermont’s contribution limits significantly reducéd challenger fundraising in competitive races). Indeed, we noted in Eddlemm that “the average gap between the 'total amount 'of money raised by incumbents and challengers for all legislative races was only $65.00 per face.” 343 F.3d at 1095. Three other circumstances underscore the tailoring of Montana’s limits to avoid unduly favoring incumbents. First, Montana permits political parties to contribute far more than individuals and PACs. As the plaintiffs’ own expert testified, political parties give predominantly to challengers in Montana, whereas PACs contribute more often to incumbents. -In Randall, by contrast, Vermont imposed identical limits on parties, individuals and PACs, reflecting an incumbency bias cutting against the limits’ constitutionality. See 548 U.S. at 256-57, 126 S.Ct. 2479 (plurality opinion). Second, Montana’s limits apply per election, rather than per cycle, meaning a contributor may give up to the limit twice if a candidate runs in a contested primary. Because challengers generally face contested primaries more often than incumbents, per election limits mitigate the incumbent fundraising, advantage. This, too, distinguishes this case from Randall, where Vermont’s per cycle limits were a “danger sign” of the limits’ unconstitutionality. See id. at 249, 126 S.Ct. 2479. Third, by prohibiting “incumbents from using excess funds from one campaign in future campaigns,” Montana “keeps incumbents from building campaign war chests and gaining a fund-raising head start over challengers.” Eddleman, 343 F.3d at 1095. The anti-challenger bias that animated the plurality in Randall simply is not present here. In sum, challengers and incumbents alike remain capable of running effective campaigns in Montana. Even if some candidates might prefer to seek fewer, larger contributions. to meet their, fundraising needs (rather than more numerous, smaller contributions), when “a candidate is merely required ‘to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression,’ the candidate’s freedom of speech is not impugned by limits on contributions.” Id. at 1091 (quoting Buckley, 424 U.S. at 21-22, 96 S.Ct. 612). We hold Montana’s limits do not prevent candidates from amassing sufficient resources to campaign effectively. » * * Montana’s limits are closely, drawn to further the state’s important interest in preventing actual or perceived quid pro quo corruption. Montana has shown the risk of quid pro quo corruption in Montana is not illusory. Its chosen contribution limits are narrowly focused; they do not prevent contributors from affiliating with the candidates of their choosing; and they do not 'prevent candidates from raising the money needed for effective campaigning, whether the candidate is an incumbent or challenger and whether the race is competitive or average. We hold, therefore, that Montana’s limits survive First Amendment scrutiny. The district court erred by holding otherwise. C. Randall Even if we were wrong in Lair II to hold Eddleman controls our evaluation of Montana’s contribution limits, we would reach the same conclusion under the plurality’s decision in Randall. The Randall test first looks for “danger signs” that the limits prevent candidates from .raising enough money to be heard, and challengers from raising enough to compete against incumbents. See, 548 U.S. at 249-52, 126 S.Ct. 2479 (plurality opinion). The plurality found four such “danger signs” in Vermont’s limits: “(1) The limits are set per election cycle, rather-than divided between primary and general elections; (2) the limits apply to contributions from political parties; (3), the limits are the lowest in the Nation; and (4) the limits are below those we have previously upheld.” Id. at 268, 126 S.Ct. 2479 (Thomas, J., concurring in the judgment) (listing the plurality’s • “danger signs”). If these “danger signs” exist, a court then assesses “five sets of considerations” to determine whether the statute was closely drawn: (1) whether th’e “contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns”; (2) whether “political parties [must] abide by exactly the same low contribution limits that apply to other contributors”; (3) whether “volunteer services” are considered contributions that would count toward the limit; (4) whether the “contribution limits are ... adjusted for inflation”; ' and (5) “‘any special justification that might warrant a contribution limit so low or so restrictive.” [Randall, 548 U.S.] at 253-62, 126 S.Ct. 2479. Lair II, 798 F.3d at 743 (first alteration in original) (citations omitted). The motions panel in Lair I addressed each of these “danger signs” and “considerations” at length, concluding that Randall likely “would not have mandated a different result in Eddleman.” 697 F.3d at 1208; see id. at 1208-13. We agree. Montana’s -limits apply per election, not per cycle. The lowest limits do not apply to political parties. The limits are not the lowest in the nation; they are higher than Alaska’s ($1000 per cycle for governor), Colorado’s ($1150), Delaware’s ($1200) and arguably Massachusetts’ ($1000 per calendar year) and Rhode Island’s ($1000 per calendar year). Although Montana’s limits are lower in absolute terms than those the Court has previously upheld, they are significantly higher than those the Court struck down in Randall ($400 per cycle for governor). They are also higher as a percentage of the cost of campaigning than the federal limits Buckley upheld.[11] Montana’s limits do not favor incumbents or prevent challengers from fundraising effectively. Political parties may contribute far more than individuals and PACs; they also may provide campaigns with paid staffers, whose wages are not counted against the party’s contribution limits. See Mont. Admin. R. 44.11.225(3). Contributors may volunteer for campaigns and otherwise express their support in ways beyond direct contributions. Finally, Montana’s limits are adjusted for inflation. Accordingly, Montana’s contribution limits would survive scrutiny even if Randall governed. IV. Conclusion Our Constitution permits contribution limits to serve the narrow but vital purpose of preventing actual or apparent quid pro quo corruption in politics. Because the limitations' imposed by Montana Code Annotated § 13-37-216 both further that interest and are adequately tailored to it, they satisfy the First Amendment. REVERSED. . Montana styles its limits on political parties as "aggregate” limits, meaning that a political party is treated as a single entity for contribution purposes, even if the party is broken down into a number of different local committees across the state. See Mont. Code Ann. § 13-37-216(2). These aggregate limits are different in kind from the ones the Supreme Court struck down in McCutcheon v. FEC, — U.S. —, 134 S.Ct. 1434. 188 L.Ed.2d 468 (2014). There, the aggregate limits meant that once an individual’s contributions to all candidates added up to the aggregate limit, he could no longer give any money to any candidates. See id. at 1443, 1448. Montana's aggregation of political party contributions, by contrast, permits a party to contribute up to the limit to as many candidates as the party wishes. . Limits shown are the maximum per cycle assuming a candidate faces a contested primary. Per election limits are one half of the amount shown. ■ . This conclusion is consistent with the Randall plurality’s decision, which did not suggest Vermont lacked a valid interest in combating quid pro quo corruption. The plurality’s analysis was focused entirely on the tailoring of Vermont's limits. See Randall, 548 U.S. at 248-60, 126 S.Ct. 2479 (plurality opinion). . Like the district court, the dissent would hold Montana to a more stringent evidentiary burden than our cases or the Supreme , .'Court’s permit. The dissent says Montana must prove the existence of actual or. apparent corruption (Dissent at 1188-89, 1189, 1190, 1190-91), whereas we—following the Supreme Court—have repeatedly held that all Montana must do is show a "threat” or “risk’’ of actual or apparent corruption. Eddleman, 343 F.3d at 1092; Farris v. Seabrook, 677 F.3d 858, 865-66 (9th Cir. 2012). The dissent similarly suggests Montana must show evidence of a completed, successful exchange of dollars for political favors to meets its eviden-tiary burden. Dissent. at 1188 n. 1, 1189, 1189-90, 1190-91. But Montana need only show that the threat of actual or apparent corruption is "not ... illusory” or is more than “mere conjecture.” Buckley, 424 U.S. at 27, 96 S.Ct. 612; Shrink, 528 U.S. at 392, 120 S.Ct. 897. For example, even if the “destroy after, reading” letter did not result in the successful purchase of a block of votes in exchange for contributions, it certainly shows that the threat of such arrangements is non-illusory. . In reaching the contrary conclusion, the dissent points to no case—and we are aware of none—where the risk of actual or apparent corruption was inadequate to justify contribution limits of some level. The plaintiffs themselves concede Montana’s pre-initiative 118 limits satisfy the First Amendment. Under the dissent’s logic, however, Montana's evidence is inadequate to justify any contribution limits whatsoever, no matter how high. See Eddleman, 343 F.3d at 1092 (explaining that the valid interest analysis is divorced from whether the state has justified the particular dollar amount of the limits at issue). On this record, that unprecedented conclusion is simply untenable. . At oral argument, the plaintiffs contended Montana must justify the change between the pre-1994 limits and today’s limits. Every contribution limit case of which we are aware, however, evaluates the current limits, and the plaintiffs point to no authority suggesting otherwise. In Randall, for example, the Court evaluated Vermont’s existing limits without discussing whether the change from Vermont's previous regime was justified. See 548 U.S. at 237, 239, 248-63, 126 S.Ct. 2479 (plurality opinion). Even if the change in limits were relevant, for the reasons we, have discussed the difference between the pre-1994 limits and today’s limits is not constitutionally significant. See Buckley, 424 U.S. at 30, 96 S.Ct. 612. .See Nat’l Conf. of State Legs,, State Limits on Contributions to Candidates 2015-2016 Election Cycle (July 31, 2015), www.ncsl.org' research/elections-and-campaigns/state-limits-on-contributions-to-candidates.aspx. . For state senate races, Montana's limits are proportionally higher than both the federal limits and those of 14 other states. . For simplicity's sake, the term "state house” refers to the lower chamber of the state legislature, even if a given state calls its lower chamber something else. . 1,402 maximum donations; 4,469 donations below the maximum but above the $35 reporting threshold; estimated 3,768 donations below the $35 threshold, assuming an average contribution of $20. . As discussed above, Montana’s limits are particularly modest when the cost of campaigning is taken into account—a useful way to measure a maximum contribution’s impact on a campaign. A maximum contribution in Montana accounted for 3.89% of the total amount a 2010 state house candidate raised. This percentage was higher than the percentage for the federal limits (0.5% across all House of Representatives races), the dollar amounts of which the Court approved in Buckley. Montana’s limits are also proportionally higher than those in Alaska (2.71%), Arizona (1.1%), California (2.19%), Colorado (1.1%), Connecticut (2.19%), Delaware (1.91%), Florida (0.-87%), Massachusetts (2.14%), Michigan (0,94%), Tennessee (3.78%), Washington (1.88%) and Wisconsin (2.98%). Thus, although Montana's limits are on the low side in absolute terms—but not an outlier—they are relatively high given the low cost of campaigning in the state.