**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DOUG LAIR; STEVE DOGIAKOS;
AMERICAN TRADITION
PARTNERSHIP; AMERICAN
TRADITION PARTNERSHIP PAC;
MONTANA RIGHT TO LIFE
ASSOCIATION PAC; SWEET GRASS
COUNCIL FOR COMMUNITY
INTEGRITY; LAKE COUNTY
REPUBLICAN CENTRAL COMMITTEE;
BEAVERHEAD COUNTY REPUBLICAN
CENTRAL COMMITTEE; JAKE OIL,
LLC; JL OIL, LLC; CHAMPION
PAINTING; JOHN MILANOVICH,
          *Plaintiffs-Appellees*,

RICK HILL, Warden,
          *Intervenor-Plaintiff-Appellee*,

v.

JONATHAN MOTL, in his official
capacity as Commissioner of
Political Practices; TIM FOX, in his
official capacity as Attorney General
of the State of Montana; LEO J.
GALLAGHER, in his official capacity
as Lewis and Clark County Attorney,
          *Defendants-Appellants.*

No. 16-35424

D.C. No.
6:12-cv-00012-
CCL

ORDER

Filed May 2, 2018

Before:  Raymond C. Fisher, Carlos T. Bea
and Mary H. Murguia, Circuit Judges.

Order;
Dissent by Judge Ikuta;
Response to Dissent by Judges Fisher and Murguia

# SUMMARY[*]

## Civil Rights

The panel denied the petition for rehearing en banc on behalf of the Court.

In its opinion, filed November 6, 2017, the panel reversed the district court's judgment in an action challenging Montana's limits on the amount of money individuals, political action committees and political parties may contribute to candidates for state elective office.

Judge Ikuta, joined by Judges Callahan, Bea, M. Smith, and N.R. Smith dissented from the denial of rehearing en banc because the majority applied a legal standard inconsistent with *McCutcheon v. FEC*, 134 S. Ct. 1434 (2014), and *Citizens United v. FEC*, 558 U.S. 310 (2010), and as a result, relied on evidence of access or influence that could not prove Montana's state interest in restricting contribution limits. Judge Ikuta would require Montana to present evidence of actual or apparent quid pro quo corruption.

Judges Fisher and Murguia responded to the dissent from the denial of rehearing en banc, and wrote that the evidentiary burden proposed by the dissent has never been adopted by the U.S. Supreme Court or this court.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**ORDER**

Judge Murguia has voted to deny the petition for rehearing en banc, and Judge Fisher has so recommended. Judge Bea has voted to grant the petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for rehearing en banc, filed November 6, 2017, is **DENIED**.

---

IKUTA, Circuit Judge, with whom CALLAHAN, BEA, M. SMITH, and N.R. SMITH, Circuit Judges, join, dissenting from denial of rehearing en banc:

In two important cases, *Citizens United* and *McCutcheon*, the Supreme Court clarified that the only state interest that can justify restrictions on campaign contributions is "quid pro quo" corruption or its appearance, and that the government must present objective evidence that such a problem exists. *See McCutcheon v. FEC*, 134 S. Ct. 1434, 1441, 1444–45 (2014); *Citizens United v. FEC*, 558 U.S. 310, 359 (2010). In doing so, the Court swept away the Ninth Circuit's case law that gave states essentially free rein to restrict campaign contributions. *See Mont. Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1096 (9th Cir. 2003) (holding that a state may justify its restrictions by showing merely a problem of "undue

influence and the appearance of undue influence by special interest groups").

Our court may not ignore such an important change in Supreme Court jurisprudence. But the majority here does just that by applying the same legal standard and evidentiary burden that we had adopted before the Supreme Court decided *McCutcheon* and *Citizens United*. *See Lair v. Motl*, 873 F.3d 1170, 1178 (9th Cir. 2017). Applying this superseded standard, the majority upholds Montana's contribution limits without *any* evidence of actual or apparent quid pro quo corruption. *See id.* at 1178–80.

Because the majority's framework contravenes *Citizens United* and *McCutcheon*, we should have taken this case en banc to correct the panel opinion's error.

I

Donor contributions are a form of political speech that merit the respect the First Amendment requires. "[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon*, 134 S. Ct. at 1448. "When an individual contributes money to a candidate, he exercises both of those rights: The contribution 'serves as a general expression of support for the candidate and his views' and 'serves to affiliate a person with a candidate.'" *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 21–22 (1976)). By contributing money, an individual participates "in an electoral debate that we have recognized is 'integral to the operation of the system of government established by our Constitution.'" *Id.* (quoting *Buckley*, 424 U.S. at 14). Thus, the First Amendment

protects an individual's "right to participate in democracy through political contributions." *Id.* at 1441.

Because the First Amendment protects political contributions, states may restrict contributions only if they can show that the restrictions meet a heightened standard of scrutiny: a state must demonstrate "a sufficiently important interest" and employ "means closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley*, 424 U.S. at 25; *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 387–88 (2000).

In *Eddleman*, our court misinterpreted *Buckley* and *Shrink Missouri* as setting a low bar for the sort of state interest that was "sufficiently important" to justify restrictions on campaign contributions. We read *Buckley* as identifying two sufficient state interests: (1) quid pro quo corruption and (2) "the avoidance of the appearance of improper influence." 424 U.S. at 27. Focusing primarily on the second prong, we extended this interpretation to hold that a state's interest in "preventing undue influence and the appearance of undue influence by special interest groups" was a sufficiently important state interest to justify limitations on campaign contributions. *Eddleman*, 343 F.3d at 1096. As a practical matter, this standard means that a state can restrict political contributions with little or no evidence of any corruption problem. *See, e.g.*, *Jacobus v. Alaska*, 338 F.3d 1095, 1114 (9th Cir. 2003) (upholding a complete ban on contributions to political parties based solely on a legislative statement that "organized special interests are responsible for raising a significant portion of all election campaign funds and may thereby gain an undue influence over election campaigns and elected officials." (quoting 1996 Alaska Sess. Laws 48 § 1(a)(3)).

But *Citizens United* and *McCutcheon* clarified that we misinterpreted *Buckley* in *Eddleman* and *Jacobus*. We now know that the only qualifying state interest is an interest in preventing quid pro quo corruption or its appearance, *Citizens United*, 558 U.S. at 359, and we also have a definition of this qualifying interest. "[Q]uid pro quo corruption" means "a direct exchange of an official act for money," *McCutcheon*, 134 S. Ct. at 1441, or "dollars for political favors," *id.* (quoting *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985)), or "the narrow category of money gifts that are directed, in some manner, to a candidate or officeholder," *McCutcheon*, 134 S. Ct. at 1452 (quoting *McConnell v. FEC*, 540 U.S. 93, 310 (2003) (opinion of Kennedy, J.)). In short, the only state interest that justifies contribution limits is the prevention of acts that "would be covered by bribery laws if a quid pro quo arrangement were proved." *Citizens United*, 558 U.S. at 356 (citation omitted).

Most important for correcting our case law, the Supreme Court has now made clear an interest in combating influence and access is not enough. *Id.* at 359. Indeed, the Court expressly rejected any "influence" standard, holding that "[r]eliance on a 'generic favoritism or influence theory . . . is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle.'" *Id.* (quoting *McConnell*, 540 U.S. at 296 (opinion of Kennedy, J.)).[1]

---

[1] The Supreme Court identified other legislative objectives that are also insufficient to suppress campaign speech, such as trying to "level the playing field," or "level electoral opportunities"; to "equaliz[e] the financial resources of candidates"; or to "restrict the speech of some elements of our society in order to enhance the relative voice of others." *McCutcheon*, 134 S. Ct. at 1450 (citations omitted).

   In light of the Supreme Court's clarification, a state can
justify imposing regulations limiting individuals' political
speech (via limiting political contributions) only by
producing evidence that it has a real problem in combating
actual or apparent quid pro quo corruption.[2]   The Court
regularly imposes such an evidentiary burden in intermediate
scrutiny contexts: the government must provide evidence that
"the harms it recites are real and that its restriction will in fact
alleviate them to a material degree." *Lorillard Tobacco Co.
v. Reilly*, 533 U.S. 525, 555 (2001) (citation omitted)
(applying intermediate scrutiny to commercial speech).  To
meet this test here, a state must show that it has a realistic
need to prevent acts that "would be covered by bribery laws,"
*Citizens United*, 558 U.S. at 356, by (for instance) presenting
evidence that large monetary contributions were made "to
control the exercise of an officeholder's official duties,"
*McCutcheon*, 134 S. Ct. at 1450, or "point[ing] to record
evidence or legislative findings suggesting any special
corruption problem," *Colo. Republican Fed. Campaign
Comm. v. FEC*, 518 U.S. 604, 618 (1996) (principal opinion).
One thing is certain: the state cannot carry its burden with
evidence showing only that large contributions increase
donors' influence or access. *McCutcheon*, 134 S. Ct. at 1441,
1451.  Even if the "line between quid pro quo corruption and
general influence may seem vague at times . . . 'the First
Amendment requires us to err on the side of protecting

---

   [2] The majority notes that "a state's contribution limits may even be
'prophylactic,'" Response at 22, citing a passage in *McCutcheon* warning
against imposing "prophylaxis-upon-prophylaxis."  134 S. Ct. at 1458
(citation omitted).   But while a state's contribution limit may be
prophylactic (meaning that a state is not limited to barring only the very
act of quid pro quo corruption), the state may not impose such a limit until
it has carried its burden of showing it has a problem with actual or
apparent quid pro quo corruption in the first place. *Id.* at 1452.

political speech rather than suppressing it.'" *Id.* at 1451 (quoting *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 457 (2007) (opinion of Roberts, C.J.)).

## II

Despite the Supreme Court's timely clarification, the majority elects to ignore it in upholding Montana's limitations on contributions. Instead, the majority articulates the following legal standard: "To satisfy its burden, Montana must show the *risk* of actual or perceived quid pro quo corruption is more than '*mere conjecture.*'" *Motl*, 873 F.3d at 1178 (emphasis added) (quoting *Eddleman*, 343 F.3d at 1092). Moreover, "Montana need not show any completed quid pro quo transactions to satisfy its burden." *Id.* at 1180. Rather, Montana "simply must show *the risk* of actual or perceived quid pro quo corruption is *not illusory*, a bar Montana's evidence easily clears." *Id.* (emphasis added).

This highly attenuated standard is two steps removed from the standard explained by *Citizens United* and *McCutcheon*. Under the majority's test, rather than prove the existence of corrupt arrangements or their appearance, a state need produce evidence only of a "risk" of such arrangements or a "perceived threat" of such arrangements. And the majority further reduces even that light burden: the "risk" or "perceived threat" need only be "more than mere conjecture" or "not illusory." *Motl*, 873 F.3d at 1178–79.

Under this standard, Montana can carry its burden of proving the need to combat actual or apparent quid pro quo corruption without presenting *any* evidence of such a problem. Instead, Montana need only produce evidence of a risk or perception of a threat that is more than merely

illusory. *See Motl*, 873 F.3d at 1179. This means that a state can justify its restrictions merely by showing a substantial donation by a special interest or a news article or survey suggesting the public is concerned about donors furthering their legislative goals. But this of course is merely evidence of access or influence, which the Supreme Court has specifically disavowed as inadequate. *Citizens United*, 558 U.S. at 359.

The majority's minimal benchmark is wholly an invention of our Ninth Circuit. Although the majority cites *McCutcheon* for its "mere conjecture" standard, it plucks the citation out of context. *Motl*, 873 F.3d at 1178. *McCutcheon* emphasized that "we 'have never accepted mere conjecture as adequate to carry a First Amendment burden,'" 134 S. Ct. at 1452 (quoting *Shrink Mo.*, 528 U.S. at 392), but it notably did not hold that a scintilla of evidence *more* than mere conjecture was sufficient. The majority's citation to *Buckley* for the "not illusory" baseline is similarly flimsy. *Buckley* held that "the deeply disturbing examples [of quid pro quo corruption] surfacing after the 1972 election demonstrate that the problem [of quid pro quo corruption] is not an illusory one." 424 U.S. at 27. Again, this is a far cry from holding that a state can justify a contribution limitation by producing a peppercorn of evidence that is not entirely imaginary. Rather, *Buckley* relied on the government's evidence of numerous specific examples of quid pro quo corruption to justify FECA's regulations.[3]

---

[3] *Buckley* relied on the D.C. Circuit's opinion, which detailed a "number of abuses uncovered after the 1972 elections." 424 U.S. at 27 n.28 (citing *Buckley v. Valeo*, 519 F.2d 821, 839–40 & nn. 36–38 (D.C. Cir. 1975), *aff'd in part, rev'd in part*, 424 U.S. 1, *and modified*, 532 F.2d 187 (D.C. Cir. 1976) (mem)). For instance, the D.C. Circuit noted that

III

Because the majority articulates the wrong standard, it relies on the wrong type of evidence. In upholding Montana's strict contribution limits, the majority relies on evidence that showed merely influence and access. First, the majority cites a state representative's testimony that "groups funnel more money into campaigns when certain special interests know an issue is coming up, because it gets results." *Motl*, 873 F.3d at 1179 (internal quotation marks and alteration omitted). This "ingratiation and access" by interest groups is not quid pro quo corruption. *McCutcheon*, 134 S. Ct. at 1441 (quoting *Citizens United*, 558 U.S. at 360).

Second, the majority cites a letter sent to party colleagues that urged other Republican representatives to vote for a bill that was "important to" a certain PAC in hopes it would "keep the contributions coming our way" and "keep [the PAC] in our camp." *Motl*, 873 F.3d at 1179. The state representative didn't offer money in exchange for votes, or state that the PAC offered money in exchange for votes; rather, he tried to impress on his colleagues that they should be influenced by the PAC's history of donations. A legislator's effort to motivate votes by pointing to helpful

dairy organizations had pledged $2,000,000 to President Nixon's 1972 campaign, and "after a meeting with dairy organization representatives, President Nixon decided to overrule the decision of the Secretary of Agriculture and to increase price supports." 519 F.2d at 839 n.36. The court also observed that a major fund raiser "pleaded guilty to a charge of violation of 18 U.S.C. § 600, in having promised, in 1971, a more prestigious post to Ambassador (to Trinidad) J. Fife Symington, in return for a $100,000 contribution to be split between 1970 senatorial candidates designated by the White House and Mr. Nixon's 1972 campaign." *Id.* at 839 n.38.

support from an interest group does not show the state has a problem with quid pro quo corruption. Moreover, *McCutcheon* is clear that "there is not the same risk of quid pro quo corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes money to a candidate directly." 134 S. Ct. at 1452. Rather, quid pro quo corruption can occur only "when an individual makes large contributions to the candidate or officeholder himself," *Id.* at 1460; *see also id.* at 1452, and here the letter cited by the majority focuses on PAC contributions towards Republicans generally — not individual contributions to individual officeholders, *see id.* at 1441–42, 1460–61.

The majority next cites a state senator's declaration "that during the 2009 legislative session the National Right to Work group promised to contribute at least $100,000 to elect Republican majorities in the next election if he and his colleagues introduced and voted for a right-to-work bill in the 2011 legislative session." *Motl*, 873 F.3d at 1179. As with the other letter, this declaration does not show quid pro quo corruption because it discusses PAC contributions funneled towards the party generally.[4] *See McCutcheon*, 134 S. Ct. at

---

[4] The majority cites *McCutcheon* for its argument that "[i]ndirect contributions to candidates can raise the same corruption concerns as direct contributions." Response at 26. But this adopts the position of the *McCutcheon* dissent, which faulted the majority for discounting the risk party committees would indirectly funnel money to a specific candidate. 134 S. Ct. at 1471–72 (Breyer, J., dissenting). By contrast, *McCutcheon* concluded that the risk of indirect contributions was too speculative to justify aggregate contribution limits. 134 S. Ct. at 1452–56. *McCutcheon* explained that scenarios that might require limits on indirect contributions were "implausible." *Id.* at 1453. For instance, a donor wishing to channel money to Representative Smith would be limited to contributing to "PACs

1441–42, 1460–61. It also confuses donations geared towards a common ideological interest — here, advancing a right-to-work bill — with quid pro quo corruption. Such "widely distributed support" intended "to further common political beliefs" does not constitute quid pro quo corruption because treating donors' "shared interest, standing alone, as an opportunity for quid pro quo corruption would dramatically expand government regulation of the political process." *Id.* at 1461.

Finally, the majority cites two default judgments in which "a state court found two 2010 state legislature candidates violated state election laws by accepting large contributions from a corporation that 'bragged . . . that those candidates that it "supported rode into office in 100% support of [the corporation's] . . . agenda."'" *Motl*, 873 F.3d at 1179 (alterations in original) (citations omitted). Here again, general support for a corporation's agenda is not a *quid* sufficient to justify restrictions on campaign contributions. *See McDonnell v. United States*, 136 S. Ct. 2355, 2372 (2016) (explaining that an official act "must involve a formal exercise of governmental power" and be "something specific and focused that is 'pending' or 'may by law be brought'

---

that are likely to give to Smith." *Id.* But his contributions "will be significantly diluted by all the contributions from others to the same PACs," and he will discover that "[h]e cannot retain control over his contribution," or "direct his money 'in any way' to Smith, or even *imply* that he would like his money to be recontributed to Smith." *Id.* (citations omitted). Therefore, "[h]is salience as a Smith supporter has been diminished, and with it the potential for corruption." *Id.* Here, as in *McCutcheon*, the National Right to Work's donation to the Republican Legislative Campaign Committee will have little "salience" to any particular candidate, and therefore presents little potential for quid pro quo corruption. *Id.*; *Motl*, 873 F.3d at 1179.

before a public official"); *McCutcheon*, 134 S. Ct. at 1441, 1450–51; *Citizens United*, 558 U.S. at 356.

The district court reviewed the evidence presented by the parties, concluding that Montana had not proven a sufficiently important state interest in preventing actual or apparent quid pro quo corruption. *Lair v. Motl*, 189 F. Supp. 3d 1024, 1032–34 (D. Mont. 2016), *rev'd*, 873 F.3d 1170 (9th Cir. 2017). The district court found that "the public would more reasonably conclude that corruption is nearly absent from Montana's electoral system — the evidence shows that despite a hand-full of opportunities, legislators chose to keep their noses clean." *Id.* at 1034. Moreover, the court concluded that "none of Defendants' examples demonstrate a real harm to the election process or to the public's interest in that process." *Id.*

The district court got it exactly right. As Judge Bea eloquently explained, *Motl*, 873 F.3d at 1187–91 (Bea, J., dissenting), Montana's evidence cannot justify contribution limits because it shows only attempts by donors to garner access or influence, or officeholders' gratitude towards supporters. Montana provided no evidence of an attempted "direct exchange of an official act for money" — just potential influence over legislators because of donors' past or future support. *McCutcheon*, 134 S. Ct. at 1441. Nor did the evidence show a public perception of quid pro quo corruption. Montana provided no surveys or empirical evidence other than its own ipse dixit regarding the public's views.

In short, the majority applies a legal standard inconsistent with *Citizens United* and *McCutcheon*, and as a result, relies on evidence of access or influence that cannot prove

Montana's state interest in restricting contribution limits. As Judge Bea explains in dissent, "[w]hile the panel majority's opinion pays lip service" to *Citizens United* and *McCutcheon*'s shift, its analysis utterly fails "to account substantively for this change." *Motl*, 873 F.3d at 1191 (Bea, J., dissenting). Rather than follow *Citizens United* and *McCutcheon*, the majority undermines them. I would follow the Supreme Court and require Montana to present evidence of actual or apparent quid pro quo corruption. I therefore dissent from the denial of rehearing en banc.

FISHER and MURGUIA, Circuit Judges, responding to the dissent from the denial of rehearing en banc:

Forty states and the federal government place limits on direct contributions to candidates for elective office. In our opinion, we upheld Montana's direct contribution limits against a First Amendment challenge, holding they served a sufficiently important interest in preventing quid pro quo corruption or its appearance and were closely drawn to achieve that purpose. *See Lair v. Motl*, 873 F.3d 1170 (9th Cir. 2017).

The dissent from the denial of rehearing en banc contends that, to demonstrate a sufficiently important state interest, Montana needed to produce evidence that quid pro quo arrangements actually exist. Dissent at 9–10. The evidentiary burden the dissent proposes, however, has never been adopted by the Supreme Court or this court. The evidentiary standard established by the Supreme Court requires that a state need only demonstrate a *risk* of quid pro quo corruption or its appearance that is neither conjectural

nor illusory. That is the standard we correctly applied here. Montana, moreover, has presented evidence of large contributors, state legislators and candidates for election attempting to enter into direct exchanges of campaign dollars for official legislative acts. This evidence is more than sufficient to demonstrate a concrete *risk* of actual quid pro quo corruption or its appearance. Because we correctly stated and applied the law, we agree with the denial of rehearing en banc.

1.

The basic framework is not in dispute. All agree that First Amendment challenges to contribution limits are subject to a two-step test. Direct contribution limits will be sustained when a state (1) "demonstrates a sufficiently important interest" and (2) "employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam). Only the first step in this framework is at issue here.

All also agree that, under the first step, the Supreme Court "has identified only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1450 (2014). States, moreover, "may target only a specific type of corruption – '*quid pro quo*' corruption." *Id.* That is, states "may permissibly seek to rein in 'large contributions that are given to secure a political quid pro quo from current and potential office holders.'" *Id.* (alteration and emphasis omitted) (quoting *Buckley*, 424 U.S. at 26). In addition, states "may permissibly limit 'the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large

individual financial contributions' to particular candidates."
*Id.* (quoting *Buckley*, 424 U.S. at 27).

Although legislating to prevent actual or apparent quid
pro quo corruption is permitted, legislating to prevent lesser
forms of corruption – mere access and influence – is not.
"Spending large sums of money in connection with elections,
but not in connection with an effort to control the exercise of
an officeholder's official duties, does not give rise to such
quid pro quo corruption." *Id.* (emphasis omitted). "Nor does
the possibility that an individual who spends large sums may
garner 'influence over or access to' elected officials or
political parties." *Id.* at 1451 (quoting *Citizens United v.
FEC*, 558 U.S. 310, 359 (2010)).

Thus, after *Citizens United* and *McCutcheon*, at step one
a state must demonstrate that the limitation furthers the state's
interest in preventing quid pro quo corruption or its
appearance, where "quid pro quo corruption" is defined as "a
direct exchange of an official act for money," or "'dollars for
political favors.'" *McCutcheon*, 134 S. Ct. at 1441 (quoting
*FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S.
480, 497 (1985)).

Although we faithfully applied all of these principles in
our opinion, the dissent from the denial of rehearing en banc
contends otherwise. As we shall explain, the dissent's
contentions are without merit.

2.

The dissent begins by accusing us of "ignor[ing] the
"important change in Supreme Court jurisprudence" brought
about by *Citizens United* and *McCutcheon*. Dissent at 5. Not

so. Our opinion specifically held that "*Citizens United . . .* and *McCutcheon . . .* limited the important state interest at [the] first step to preventing 'quid pro quo corruption, or its appearance,'" *Lair*, 873 F.3d at 1177 (quoting *Lair v. Bullock*, 798 F.3d 736, 746 (9th Cir. 2015)), and we expressly required Montana to meet this revised standard, *see id.* at 1178–80.

3.

The dissent also disagrees with us regarding the nature of the evidence a state must produce to establish a sufficiently important interest in preventing quid pro quo corruption or its appearance. The dissent contends a state can meet its burden at step one only by proving "the *existence* of corrupt arrangements or their appearance." Dissent at 9 (emphasis added). Without such evidence, according to the dissent, states are wholly precluded from imposing direct contribution limits in *any* amount. We, by contrast, held that a state can satisfy its burden at step one by showing a *risk* of quid pro quo corruption or its appearance that is neither conjectural nor illusory. *See Lair*, 873 F.3d at 1178. A review of the case law compels the conclusion that our approach is correct.

Tellingly, the dissent can cite to no authority, at either the Supreme Court or any other level, requiring a state to prove the *existence* of quid pro quo arrangements at step one. The Supreme Court has never required a state to do so. Instead, the Court has required a state to demonstrate only "a cognizable *risk* of corruption" – a "*risk* of quid pro quo corruption or its appearance" that rises above "mere conjecture." *McCutcheon*, 134 S. Ct. at 1452 (emphasis altered) (quoting *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 392 (2000)). The state need only "demonstrate

that the problem is not an illusory one." *Buckley*, 424 U.S. at 27.

When it comes to direct contribution limits, the Court has never imposed an onerous evidentiary burden at step one. As the Court made clear in *Shrink Missouri*, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Shrink Missouri*, 528 U.S. at 391. Because "the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible," *id.*, the Court has "declined to impose, let alone articulate, a stringent evidentiary burden" in the context of direct contribution limits, *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1122 (9th Cir. 2011) (quoting *Citizens for Clean Gov't v. City of San Diego*, 474 F.3d 647, 653 (9th Cir. 2007)).

This low evidentiary burden is confirmed by case law. Because "the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt" are generally understood as presenting a real problem, *Shrink Missouri*, 528 U.S. at 391, the Supreme Court has never held that a state – or Congress – failed to meet its evidentiary burden at step one. The Court has either upheld direct contribution limits, or struck them down at step two, which is not at issue here. *See Buckley*, 424 U.S. at 20–28 (upholding federal limits); *Shrink Missouri*, 528 U.S. at 390–97 (upholding state limits); *Randall v. Sorrell*, 548 U.S. 230, 249–62 (2006) (plurality opinion) (rejecting state limits at step two, i.e., because they were "not closely drawn").

The dissent's view that a state must show the *existence* of quid pro quo corruption or its appearance is not supported by the four cases upon which the dissent relies – *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001), *Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604, 618 (1996) (plurality opinion), *Citizens United* and *McCutcheon*.

*Lorillard* is a commercial speech case concerning tobacco regulations, not campaign contribution limits. *Buckley*, *Shrink Missouri* and *McCutcheon* govern here, not *Central Hudson* or *Lorillard*.[1]

The dissent's reliance on *Colorado Republican* is also misplaced. Because *Colorado Republican* is a campaign *expenditure* case, not a contribution case, it has no application here. As the Supreme Court explained in *Shrink Missouri*, *Colorado Republican* "did not deal with a government's burden to justify limits on contributions." *Shrink Missouri*, 528 U.S. at 392. "Although the principal opinion in that case charged the Government with failure to show a real risk of corruption, the issue in question was limits on independent

---

[1] *Lorillard* applied the *Central Hudson* commercial speech test. Under *Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.*, 447 U.S. 557 (1980), "[a]t the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 475 (1989) (quoting *Central Hudson*, 447 U.S. at 566).

expenditures by political parties, which the principal opinion expressly distinguished from contribution limits: 'limitations on independent expenditures are less directly related to preventing corruption' than contributions are." *Id.* (citation omitted) (quoting *Colorado Republican*, 518 U.S. at 615 (plurality opinion)).

Nor does anything in *Citizens United* or *McCutcheon* require a state produce evidence that quid pro quo arrangements actually *exist*. On the contrary, "because few if any contributions to candidates will involve quid pro quo arrangements," and "'the scope of such pernicious practices can never be reliably ascertained,'" *Citizens United* expressly recognizes that "restrictions on direct contributions are *preventative*." *Citizens United*, 558 U.S. at 356–57 (emphasis altered) (quoting *Buckley*, 424 U.S. at 27). They "*ensure against* the reality or appearance of corruption." *Id.* at 357 (emphasis added). Similarly, recognizing "'the opportunities for abuse *inherent* in a regime of large individual financial contributions' to particular candidates," *McCutcheon* requires a state to demonstrate only "a cognizable *risk* of corruption" – a "*risk* of quid pro quo corruption or its appearance" that rises above "'mere conjecture.'" *McCutcheon*, 134 S. Ct. at 1450, 1452 (emphasis altered) (quoting *Buckley*, 424 U.S. at 27, and *Shrink Missouri*, 528 U.S. at 392).[2]

---

[2] We do not read *Citizens United* and *McCutcheon* as calling the ongoing validity of direct contribution limits into doubt. *Citizens United* noted that direct contribution limits "have been an accepted means to prevent quid pro quo corruption." *Citizens United*, 558 U.S. at 359 (emphasis omitted). In the post-*Citizens United*, post-*McCutcheon* world, the Supreme Court continues to recognize that "contribution limits advance the interest in preventing quid pro quo corruption and its appearance in political elections." *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1672 (2015) (emphasis omitted).

When it comes to direct contribution limits, then, *Citizens United* and *McCutcheon* go hand in hand with previous decisions, not toe to toe.  This line of cases, beginning with *Buckley* and continuing through *McCutcheon*, demonstrates that, in the context of contribution limits, the anti-corruption interest is sufficiently well-established that a state need not satisfy a stringent evidentiary burden at step one.  Indeed, a state's contribution limits may even be "prophylactic."  *See McCutcheon*, 134 S. Ct. at 1458 (describing direct contribution limits as a "preventative," "prophylactic measure"); *Nat'l Conservative Political Action Comm.*, 470 U.S. at 500 (noting that the Court will accord "proper deference to a congressional determination of the need for a prophylactic rule where the evil of potential corruption had long been recognized"); *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 210 (1982) ("Nor will we second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared.").

In sum, we properly held that a state need only produce evidence of a cognizable *risk* of quid pro quo corruption or its appearance.  *See McCutcheon*, 134 S. Ct. at 1452.  The state need not, as the dissent contends, "prove the existence of corrupt arrangements or their appearance."  Dissent at 9.

4.

Assuming we are correct that a state is required to demonstrate only a *risk* of quid pro quo corruption rather than the *existence* of such corruption, the dissent contends we nonetheless erred by requiring Montana to show only that the problem is neither illusory nor conjectural.  Dissent at 9–10.  Because the Supreme Court has repeatedly used these very words, however, we believe we properly included them in our

opinion. *See McCutcheon*, 134 S. Ct. at 1452 ("mere conjecture"); *Shrink Missouri*, 528 U.S. at 392 ("merely conjectural"); *id.* ("mere conjecture"); *Buckley*, 424 U.S. at 27 ("the problem is not an illusory one"). We were, moreover, bound by circuit precedent on this point. *See Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir. 2003) ("With respect to the quantum of evidence necessary to justify this interest, the Supreme Court has required only that the perceived threat not be 'illusory,' *Buckley*, 424 U.S. at 27, or 'mere conjecture,' *Shrink Missouri*, 528 U.S. at 392), *abrogated on other grounds as stated in a Lair*, 798 F.3d at 745. And in any event, as discussed below, the evidence Montana has presented here demonstrates a concrete risk of quid pro quo corruption. This case, therefore, "does not present a close call requiring further definition of whatever the State's evidentiary obligation may be." *Shrink Missouri*, 528 U.S. at 393.

5.

The dissent also contends our opinion, in effect, allows a state to impose direct contribution limits based on evidence of mere "access or influence, which the Supreme Court has specifically disavowed as inadequate." Dissent at 10. Under our opinion, according to the dissent, "a state c[ould] justify its restrictions merely by showing a substantial donation by a special interest or a news article or survey suggesting the public is concerned about donors furthering their legislative goals." Dissent at 10.

We disagree. Our opinion does *not*, as the dissent charges, allow a state to "carry its burden with evidence showing only that large contributions increase donors' influence or access." Dissent at 8. On the contrary, the

opinion squarely rejects the access or influence theory, *see Lair*, 873 F.3d at 1177, and it makes abundantly clear that the problem the state must demonstrate is quid pro quo corruption or its appearance, *see id.* at 1172, 1177, 1178, 1179, 1180, 1181, 1186. We do not hold that the type of evidence the dissent describes – the mere existence of a large contribution, or evidence that voters are concerned that contributors have access or influence – would suffice. Notably, the evidence in this case, which we discuss in greater detail below, does not relate to mere access or influence. It demonstrates a concrete risk of actual and apparent quid pro quo corruption.

6.

We also disagree with the dissent's contention that the evidence Montana presented in this case was insufficient to satisfy step one. The dissent's evaluation of the evidence, of course, is based on its contention that Montana was required to prove the *existence* of quid pro quo corruption or its appearance. As we have explained, Montana was required to show only a *risk* of such corruption. Thus, to the extent the dissent finds Montana's evidence wanting merely because it fails to establish the existence of quid pro quo arrangements or their appearance, the dissent's arguments are unpersuasive for the reasons already discussed.

We further disagree that Montana failed to establish even a *risk* of quid pro quo corruption or its appearance, because the state's evidence shows only "influence and access." Dissent at 11. Montana's evidence, which shows attempts by contributors, lawmakers and candidates to exchange campaign contributions for official legislative acts, plainly demonstrates a *risk* of quid pro quo arrangements that

Montana was constitutionally permitted to legislate to prevent.

State Senator Mike Anderson, for example, sent a "destroy after reading" letter to his party colleagues, urging them to vote for a specific bill so a political action committee would funnel contributions to the party's candidates:

> Dear Fellow Republicans. Please destroy this after reading. Why? Because the Life Underwriters Association in Montana is one of the larger Political Action Committees in the state, and I don't want the Demo's to know about it! In the last election they gave $8,000 to state candidates. . . . Of this $8,000 – Republicans got $7,000 – you probably got something from them. This bill is important to the underwriters and I have been able to keep the contributions coming our way. In 1983, the PAC will be $15,000. Let's keep it in our camp. Mike.

State Senator Bruce Tutvedt testified that the National Right to Work group promised to contribute at least $100,000 to the Republican Legislative Campaign Committee if he and his colleagues introduced and voted for a right-to-work bill in the 2011 legislative session. Under the proposed arrangement, "if Republican legislators promised to introduce a right-to-work bill and get a vote of record in both houses, then the Republican Legislative Campaign Committee would receive in exchange $100,000 with more available if needed to elect Republican majorities to the Montana House and Senate."

Montana also presented evidence that a state court found two 2010 state legislature candidates violated state election laws by accepting large contributions from a corporation that "bragged . . . that those candidates that it supported 'rode into office in 100% support of [the corporation's] . . . agenda.'" *See Comm'r of Political Practices v. Prouse*, DDV-2014-250 (1st Jud. Dist. Mont. 2016); *Comm'r of Political Practices v. Boniek*, XADV-2014-202 (1st Jud. Dist. Mont. 2015).

We are not necessarily persuaded by the dissent's contention that none of these proposed exchanges involved quid pro quo arrangements. For example, that the National Right to Work group planned to funnel contributions to compliant lawmakers through the Republican Legislative Campaign Committee, rather than giving it to the lawmakers directly (Dissent at 11–12), does not negate the possibility of quid pro quo corruption. Indirect contributions to candidates can raise the same corruption concerns as direct contributions. *See McCutcheon*, 134 S. Ct. at 1442, 1446–47, 1453, 1455–56 (recognizing the importance of limits on indirect contributions in order to prevent circumvention of direct contribution limits, because the risk of corruption arises when a contributor "directs his money 'in any way'" to a particular candidate (quoting 2 U.S.C. § 441a(a)(8))); *California Med. Ass'n v. FEC*, 453 U.S. 182, 197–98 (1981) (plurality opinion) (same). Quid pro quo corruption requires only that the money is "directed, *in some manner*, to a candidate or officeholder." *McCutcheon*, 134 S. Ct. at 1452 (emphasis added) (quoting *McConnell v. FEC*, 540 U.S. 93, 310 (2003) (opinion of Justice Kennedy)). Similarly, to the extent the dissent suggests that a direct exchange of dollars for legislative acts cannot constitute quid pro quo corruption if lawmakers and contributors share "a common ideological interest" (Dissent at 13), we can find no authority for this

proposition.   We are similarly skeptical of the dissent's contention that the 2010 legislative candidates promised only "general support" for the corporate contributor's agenda (Dissent at 13); the candidates' promises to provide "100% support of [the contributor's] responsible development agenda" may well have encompassed promises with respect to specific legislative acts.

These questions, however, are beside the point.  Because Montana was required to establish only a cognizable risk of quid pro quo corruption or its appearance, it is irrelevant whether Montana has shown the existence of quid pro quo arrangements.  The evidence presented by Montana, which shows serious attempts to exchange campaign dollars for official legislative acts, is more than adequate to show a cognizable risk of corruption.   Montana, therefore, has demonstrated a sufficiently important governmental interest in limiting direct contributions.

* * *

We agree with the denial of rehearing en banc.